**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12661

————————————————

SAVANNAH SHOALS, LLC,

GREEN CREEK RESOURCES, LLC,

TAX MATTERS PARTNER,

*Petitioners-Appellants,*

*versus*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

————————————————

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 3412-22

————————————————

Before BRANCH, LUCK, Circuit Judges, and MORENO,* District Judge.

BRANCH, Circuit Judge:

Savannah Shoals, LLC ("Savannah Shoals") granted a conservation easement over a 103-acre tract of land, claiming a $23 million tax deduction for the contribution. The Internal Revenue Service ("IRS") rejected the deduction and imposed penalties because it believed that Savannah Shoals had significantly overstated the easement's value. The tax court agreed with the IRS, determining that the "highest and best use" Savannah Shoals claimed for the tract of land—an aggregate quarry—was not viable, so the land was worth only $480,000, a far cry from Savannah Shoals's multi-million-dollar deduction.

Savannah Shoals raises a number of challenges to the tax court's decision, primarily arguing that the tax court was required to undertake a four-factor test when it analyzed the property's highest and best use. But neither the relevant statutory and regulatory provisions nor our caselaw requires the use of such a test. The tax court properly concluded that it was unlikely Savannah Shoals's property would be used as an aggregate quarry because the market would not support such a use. Because Savannah Shoals's other challenges likewise fail, we affirm the tax court's judgment.

---

* Honorable Federico Moreno, United States District Judge for the Southern District of Florida, sitting by designation.

## I.　　Background

In 2007, a developer purchased around 430 acres of land in Hart County, Georgia. During the following years, the developer sold a few lots and took steps toward developing the property, but eventually set the project aside. In 2017, the developer entered an agreement to sell its interest in 103 acres (the "Property") to an investment company who planned, in turn, to donate a conservation easement over that land. Later that year, engineering contractors obtained samples of subsurface materials on the Property and tested those materials. They determined that the materials qualified to be used as crushed rock aggregate. An expert prepared a report on the profitability of an aggregate quarry on the Property. He concluded that, based on a discounted cashflow ("DCF") analysis, the net present value of mineable aggregate on the Property was $23.1 million.

In October 2017, Savannah Shoals was formed, and the developer agreed to contribute the Property to Savannah Shoals—as Savannah Shoals's only asset—in exchange for a 95% membership interest. The developer then agreed to sell 92% of its membership interest in Savannah Shoals for $515,000 to a separate partnership, Savannah Shoals Investments, LLC. By December 28, 2017, these transactions were completed. That same day, Savannah Shoals Investments granted a conservation easement over the Property to Southeast Regional Land Conservancy, Inc. On its 2017 tax return, Savannah Shoals claimed a $23 million deduction for the donation of the easement.

On December 21, 2021, the IRS issued Savannah Shoals a Final Partnership Administrative Adjustment, which stated that Savannah Shoals had failed to establish that its contribution qualified for the deduction and, even if the contribution qualified, that Savannah Shoals had failed to establish the value of the contribution.  The IRS thus determined that a 40% penalty for gross valuation misstatement was warranted.  On March 1, 2022, Savannah Shoals filed a petition in the U.S. Tax Court challenging these determinations.  After discovery, the tax court held a four-day trial during which it heard testimony from 13 witnesses.  The court subsequently issued a memorandum opinion finding that Savannah Shoals qualified for the deduction but had significantly overstated the value of the easement, triggering the 40% penalty.

In its opinion, as relevant to this appeal, the court began its valuation analysis by assessing the Property's highest and best use. Savannah Shoals argued that the Property's highest and best use was as an aggregate quarry, while the Commissioner argued it was low-density residential and recreational uses.  The court assessed reports and testimony from Savannah Shoals's experts Richard Capps, Douglas Kenny, and Greg Gold and Commissioner expert Kevin Gunesch regarding the financial feasibility of establishing and operating a quarry on the Property.

First, the court noted that the parties' experts agreed "the market for aggregate is limited to an area within a 50-mile radius of a quarry" because transportation costs for aggregate are high. The court noted that "the area surrounding the easement property

[was] primarily rural," with a "small population" and "minimal growth during the relevant period." The larger metro areas that Savannah Shoals's experts pointed to—Greenville, Augusta, and Atlanta—were much further away, making it less likely a quarry in Hart County would be successful at reaching those markets. The tax court discounted Gold's testimony regarding the per capita demand for aggregate because Gold "based his demand calculations on statewide aggregate demand" in South Carolina and Georgia without accounting for differing demands in rural areas and population centers. The court likewise noted that Gold's calculated "statewide demand figures . . . [were] significantly higher than nationwide demand."

Next, the tax court considered competition from existing quarries, especially those closer in proximity to large population centers. The court noted that none of Savannah Shoals's experts "took into account competition from other quarries." Only the Commissioner's expert Gunesch "adequately examined the effect that competing quarries would have had on the size of the proposed quarry's market." He had identified at least seven quarries close to the nearest population center, the Greenville metro area. Athens, another population center around 50 miles from Hart County, also had "multiple suppliers that are closer than the easement property." Each of these closer quarries would have significant "delivered price advantage[s]" over a quarry on the Property.

The court finally credited Gunesch's testimony that "a quarry operating in line with Mr. Gold's DCF analysis would have an operating profit margin of 67%" while the "average industry profit margin is 24%," yet another indication that Savannah Shoals's "experts' production figures are unreasonable." Based on all of this evidence, the court concluded that "petitioner's experts overestimated annual sales of aggregate from the proposed quarry and overstated its potential profitability." The court thus adopted the Commissioner's proposed highest and best use—low density residential and recreational use—based on expert evidence from Commissioner expert Charles Brigden.

The court then assessed the Property's value before and after the easement's donation based on a residential and recreational best use in order to calculate the fair market value of the easement. It reviewed Brigden's comparable sales analysis, which resulted in values between $3,198 and $4,626 per acre for a proposed "before" price of $420,000. It noted that Brigden had performed a second comparable sales analysis based on other properties sold for mining uses. From that analysis, Brigden offered average and median adjusted prices of $8,532 and $7,392 per acre, respectively. While the court did not adopt these values, because it had concluded that a quarry was not the Property's highest and best use, it offered this evidence as "confirm[ation] that [Savannah Shoals] claimed an exorbitantly high, baseless value for the unencumbered easement property." Ultimately, the court relied most heavily on the actual sale of the interest in the Property completed the same day the easement was donated. The court

determined that the $515,000 paid for a 92% interest was reflective of the Property's fair market value at the time. Based on this evidence, the court found that the Property's value before the easement was $580,000. It adopted Brigden's proposed value of the Property after the easement's donation—$100,000—as more favorable to Savannah Shoals's value calculation than Savannah Shoals own proposed "after" value of $290,000. The court therefore found that the easement's fair market value on the donation date was $480,000. Because Savannah Shoals had claimed a $23 million deduction—significantly more than 200% of the easement's actual value—the court imposed a 40% gross valuation misstatement penalty.

Savannah Shoals timely appealed the tax court's decision.

## II.    Standard of Review

"We review the tax court's legal conclusions *de novo* and its findings of fact for clear error." *Palmer Ranch Holdings Ltd. v. Comm'r*, 812 F.3d 982, 993 (11th Cir. 2016). "A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to *de novo* review." *Id.* at 994 (quotation omitted).

## III.    Discussion

This case arises in the context of 26 U.S.C. § 170, which "allows tax deductions for charitable contributions and gifts of interests in real property." *Pine Mountain Pres., LLLP v. Comm'r*, 978 F.3d 1200, 1203 (11th Cir. 2020). Among various qualifying

contributions, a taxpayer may claim a deduction for a "qualified conservation contribution": traditionally, a conservation easement. *See id.* (quoting 26 U.S.C. § 170(h)(1)). "To qualify as a 'qualified conservation contribution,' a grant must be '(A) of a qualified real property interest,' '(B) to a qualified organization,' and '(C) exclusively for conservation purposes.'" *Id.* (quoting 26 U.S.C. § 170(h)(1)).

In addition to meeting these requirements, a taxpayer claiming a deduction must prove the amount of the deduction: that is, the value of the easement contribution. *See Palmer Ranch*, 812 F.3d at 1002. "The value of . . . a charitable contribution of a perpetual conservation restriction"—*i.e.*, a conservation easement—"is the fair market value of the perpetual conservation restriction at the time of the contribution." 26 C.F.R. § 1.170A-14(h)(3)(i). The Treasury Regulations offer two alternative methods of valuing a conservation easement. First, if evidence of comparable easement sales is available, "the fair market value of the donated easement is based on the sales prices of such comparable easements." *Id.* But when such evidence is not available, the "before-and-after" method is used. *TOT Prop. Holdings, LLC v. Comm'r*, 1 F.4th 1354, 1369 (11th Cir. 2021).

"The before-and-after method calculates the fair market value as the difference between the fair market value of the property pre- and post-encumbrance." *Id.* (quotation omitted); *see* 26 C.F.R. § 1.170A-14(h)(3)(i). For purposes of the before-and-after method, the fair market value of property is based on the land's

"highest and best use." *TOT Prop.*, 1 F.4th at 1369; *see* 26 C.F.R. § 1.170A-14(h)(3)(ii). Parties first determine the property's highest and best use, then "calculate a dollar value based on that use." *TOT Prop.*, 1 F.4th at 1370.

The tax court concluded that Savannah Shoals was entitled to an easement deduction, and the Commissioner does not challenge that conclusion here. Nor does Savannah Shoals directly challenge the tax court's ultimate valuation of the easement. Instead, it argues that the court made several errors in its assessment of the Property's highest and best use before the easement was granted (which it presumably believes skewed the resulting valuation). Specifically, it argues that (1) the court improperly admitted and relied on expert testimony and hearsay evidence regarding the Property's possible use as a quarry; (2) the court applied the wrong legal test for highest and best use; and (3) the court erred in its factfinding and failed to make written findings of fact and conclusions of law regarding the Property's highest and best use. After considering each issue, we affirm the tax court's decision.

A.    *The tax court did not abuse its discretion by admitting or relying on the Commissioner's expert's report and testimony*

Savannah Shoals begins by challenging the tax court's decision to admit and rely upon certain evidence the Commissioner offered through its expert Charles Brigden. First, Savannah Shoals contests the admissibility of Brigden's testimony, maintaining that Brigden, a real estate appraiser, lacked the

expertise to opine on "mining issues," so the court erred when it relied on him for "mining conclusions." Second, Savannah Shoals argues that the tax court erred by relying on certain geological maps as substantive evidence and by allowing Brigden to rely on them for his opinions. Savannah Shoals further contends that both Brigden and the tax court misread those maps, leading them to draw incorrect conclusions regarding the availability of aggregate for mining throughout the region surrounding the Property. Each of Savannah Shoals's evidentiary challenges fails.

We review the tax court's evidentiary decisions, including its decision to admit expert testimony, for abuse of discretion. *See Curtis Inv. Co., LLC v. Comm'r*, 909 F.3d 1339, 1349 (11th Cir. 2018). "This Court will not reverse an evidentiary decision of a [trial] court unless the ruling is manifestly erroneous." *In re Teltronics, Inc.*, 904 F.3d 1303, 1310 (11th Cir. 2018) (quotations omitted).

1.    The tax court did not abuse its discretion when it admitted the Commissioner's expert's report and allowed him to testify

Savannah Shoals claims the tax court erred when it allowed the Commissioner's expert Brigden to testify about mining issues because he was not qualified to do so under Federal Rule of Evidence 702. It asserts that he lacked "the knowledge, skill, experience, training, or education to opine on mining issues," and thus his conclusions regarding "mining issues" should not have been admitted, and the court should not have relied on them.

The Commissioner responds that Brigden appropriately testified regarding his area of expertise: the real estate market. Brigden's testimony on that subject, he argues, was both admissible and reliable.

"Federal Rule of Evidence 702 governs admission of expert testimony in Tax Court." *Curtis Inv. Co.*, 909 F.3d at 1349. When screening expert evidence for admissibility, the court should consider whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*[1]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quotation omitted). "[T]rial judges have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Curtis Inv. Co.*, 909 F.3d at 1350 (quotations omitted). And our review of the lower court's decision to admit expert testimony "is even more relaxed in a bench trial situation, where the judge is serving as a factfinder and

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

we are not concerned about dumping a barrage of questionable scientific evidence on a jury." *In re Teletronics*, 904 F.3d at 1311–12 (quotations omitted).

Savannah Shoals does not appear to have raised a *Daubert* challenge to Brigden's expert report or testimony during the proceedings below.[2] It thus forfeits a challenge to Brigden's evidence based on his expert qualification pursuant to Rule 702. *See Lindsey v. Navistar Int'l Transp. Corp.*, 150 F.3d 1307, 1315 n.2 (11th Cir. 1998).

In any event, the tax court did not erroneously rely on Brigden's purported mining opinions in its assessment of the Property's highest and best use as a quarry. Savannah Shoals flags certain of the court's statements it believes inappropriately relied on Brigden's mining conclusions:

> [1] [Brigden] testified that aggregate is abundant in the area. . . . [2] He opined that because aggregate is abundant, the easement property is not unique and this lack of uniqueness made the discounted cashflow analysis an inappropriate method to value the easement property. [3] He further opined that the easement property did not have a comparative

---

[2] At trial, the Commissioner offered Brigden as an "expert in real estate valuation and qualified conservation contribution valuation," and Savannah Shoals did not object. Savannah Shoals does not challenge Brigden's real estate expertise on appeal.

> advantage as a quarry over other land with known aggregate deposits.

But these statements demonstrate no erroneous conclusions by the tax court. First, these statements simply describe Brigden's analysis; they do not indicate that the tax court adopted these opinions as its own. Second, the court did not independently rely on any of these opinions in forming its own conclusions about the Property's highest and best use.

As to the first statement, regarding the presence of aggregate in the area, the court noted that Kenny, Savannah Shoals's own valuation expert, agreed that "aggregate is abundant in the region." Kenny testified that "the geological maps would support [the] conclusion" that other properties in Hart County "also have gneiss[3] under the surface," although he noted that the presence of gneiss did not necessarily make mining feasible on every property. Thus, while the tax court did indeed conclude that aggregate was abundant in the region, that conclusion did not depend on Brigden's testimony.

The second statement concerns the appropriate manner of valuing such a property and the infeasibility of a DCF analysis when aggregate is abundant. The tax court certainly did not adopt Brigden's opinion on this point, because it proceeded to discuss

---

[3] The tax court noted that the experts "refer[red] to the subsurface materials by different names including biotite gneiss and granitic gneiss," while the engineering contractors Savannah Shoals engaged to test the materials used the term "aggregate," which term the tax court adopted.

aspects of each party's DCF analysis at length. The court's ultimate rejection of Savannah Shoals's projections resulted from its determination that certain of Savannah Shoals's experts' estimates were unreliable and unreasonable, not from any finding that a DCF analysis was inappropriate. Thus this argument too fails.

The third statement relates to the relative value of the Property as a quarry compared to its value for residential and recreational uses. But because the tax court rejected a quarry as the Property's highest and best use, Brigden's alternate valuation of the Property as such is irrelevant. Although Brigden had initially concluded that the Property's highest and best use was for residential and recreational uses, the Commissioner asked him to analyze the value of the land "under the special assumption that a mining use is the most probable or most likely use." Based on that analysis, Brigden opined that "land areas associated with known deposits of granite do not enjoy a price premium above non-granite area properties in Hart County." But, again, since the tax court rejected the proposed quarry use altogether, it did not erroneously rely on this testimony.

Instead of relying on Brigden, the tax court's rejection of a quarry use relied primarily on the testimony of *other* expert witnesses. The court's analysis of the Property's highest and best use spans five and a half pages. After briefly describing Brigden's opinion and noting his conclusion—that the Property's highest and best use was "low-density residential and recreational uses"—the court spent five pages considering the evidence presented by both

24-12661              Opinion of the Court                15

parties' mining and valuation experts regarding the financial feasibility of a quarry on the Property. In its analysis, the court discussed at length the competing evidence from Savannah Shoals's experts Gold, Capps, and Kenny and from the Commissioner's expert Gunesch, and based its ultimate conclusions on what it determined to be the most reliable evidence from each expert.[4] The court considered the size of the market for aggregate and competition from existing quarries in the area before concluding that Savannah Shoals's experts "overestimated annual sales of aggregate from the proposed quarry and overstated its potential profitability." Based on its determination that a quarry was not financially feasible, the court was left with Brigden's proposed use drawn from his own real estate expertise—low density residential and recreational uses—which the court found credible and thus adopted as its own.

For these reasons, we find that the court did not erroneously admit or rely on Brigden's purported mining conclusions.

---

[4] The court mentioned Brigden only once in this portion of its analysis, noting that he opined that transportation costs limited a quarry's market to a 25-mile radius. The court observed that Savannah Shoals's experts testified that the market was limited to a 50-mile radius. The Commissioner's mining expert Gunesch opined that the "preferred market" for this particular Property would be "limited to a maximum distance of about 20 miles in a northwest to southeast orientation and about 6 miles in a southwest to northeast orientation" because of competing quarries located close by. Based on Gunesch's evidence regarding competition from other quarries, the court determined that "the proposed quarry's market was likely limited to the area less than 25 miles from the proposed quarry."

16                    Opinion of the Court                    24-12661

2.      The tax court did not abuse its discretion by considering or allowing Brigden to rely on certain geological maps

Federal Rule of Evidence 703 allows an expert to base his opinion on the "kinds of facts or data" that "experts in the particular field would reasonably rely on," even if those facts might not be separately admissible.[5]    Fed. R. Evid. 703.    Savannah Shoals contends that the court compounded its error regarding Brigden's testimony by allowing him to rely on geological maps and by itself relying on the maps to reach certain conclusions about the presence of aggregate in the region and the uniqueness of the Property.  It asserts that because Brigden was a real estate expert rather than a mining expert, it was inappropriate for him to use these maps in forming his opinions pursuant to Federal Rule of Evidence 703.  It further argues that because the maps themselves were merely included in Brigden's report rather than being separately admitted as evidence, they constituted hearsay that the court erred in relying on as substantive evidence.    The Commissioner responds that that maps in question are from official sources and thus were appropriate for judicial notice pursuant to Federal Rule of Evidence 201.

---

[5] As a reminder, while the tax court is bound by the Federal Rules of Evidence, our review of the admission of expert testimony in a bench trial is "even more relaxed" than usual, because "the judge is serving as a factfinder and we are not concerned about dumping a barrage of questionable scientific evidence on a jury." *In re Teletronics*, 904 F.3d at 1311–12 (quotations omitted).

Savannah Shoals's challenge fails for three reasons.  First, as with the evidentiary challenge we discussed in the previous subsection, there is no record that Savannah Shoals objected to the inclusion of the maps in Brigden's report—or his reliance on them—during the litigation below, so it failed to preserve an evidentiary challenge for appeal on that basis.  *See Cent. Baptist Church of Albany, Ga., Inc. v. Church Mut. Ins. Co.*, 146 F.4th 1003, 1015 (11th Cir. 2025).  So we need not determine whether Brigden's inclusion of these maps in his report was appropriate.

Second, the court could appropriately take judicial notice of the maps.  Federal Rule of Evidence 201 allows courts to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  "[O]fficial government maps have long been held proper subjects of judicial notice."  *Gov't of Canal Zone v. Burjan*, 596 F.2d 690, 694 (5th Cir. 1979).[6]  For example, we have previously taken judicial notice of the relative location of two businesses based on a map.  *See United States v. Proch*, 637 F.3d 1262, 1266 & n.1 (11th Cir. 2011).

Here, there is no reasonable dispute about the maps' accuracy.  The maps and accompanying data Brigden included in

---

[6] *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (holding that all decisions from the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit").

18                  Opinion of the Court                24-12661

his report that Savannah Shoals appears to challenge were taken from the United States Department of Agriculture's Geospatial Data Gateway, the United States Geological Survey, and the Georgia Department of Natural Resources, all "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Savannah Shoals itself "does not contest the accuracy of these maps" and concedes that "the parties agree Hart County contains other properties with granite or gneiss deposits." The maps were not the only evidence of aggregate throughout the region: as noted above, Savannah Shoals's own expert agreed that "the geological maps would support [the] conclusion" that other properties in Hart County "also have gneiss under the surface." In other words, the maps' accuracy is not in dispute, making the maps appropriate for judicial notice. *See id.* Thus, to the extent the court relied on the maps themselves, it did not abuse its discretion.[7]

Instead, Savannah Shoals's true disagreement appears to be with Brigden's opinion that "land areas associated with known deposits of granite do not enjoy a price premium above non-granite area properties in Hart County." Based on the presence of aggregate throughout the region (as demonstrated by the maps), Brigden opined that the Property was not unique in the region, so even if it could be used as a quarry, its fair market value would not

---

[7] It should be noted, though, that the tax court relied on the maps minimally, if at all: it mentioned the maps only twice, in a single footnote discussing Brigden's evidence regarding the Property's valuation, and it did not explicitly rely on the maps for any factual findings.

be greatly inflated.  Savannah Shoals, on the other hand, insists that its Property was unique—and thus more valuable than other vacant land in the county—because not all aggregate is economically viable, and it had performed feasibility studies to ensure that "granite deposits could be profitably extracted."[8]

But this argument fails too.  Brigden's testimony about the Property's uniqueness related to the value of the Property, not to its highest and best use.  And, as discussed above, the court did not rely on Brigden's opinions regarding aggregate and mining in the region to reject the proposed quarry use as the Property's highest and best use.  Instead, it pointed to the small population and corresponding low demand for aggregate within a commercially reasonable range of the Property and the existence of competing quarries closer to high-population areas, based on the testimony of the other experts.  Thus, the tax court did not erroneously rely on

---

[8] As the tax court noted, though, Savannah Shoals's own expert called this assertion into question.  Gold testified that "in general, the aggregate industry does not use feasibility studies" because "rock is fairly easy to find."  Unlike the studies needed for a metals mine to determine "whether what's in the ground can be developed into something that can be sold," Gold testified that "[t]he process of aggregates is quite simple."  "You take rock.  It's a good rock.  You crush it.  You sell it.  And so generally, there's not a whole bunch of stages."  The court separately determined that the testing performed at the Property did not constitute a true feasibility study according to industry standards.  The fact that Capps, one of Savannah Shoals's experts, categorized the results of the testing as if a feasibility study had been performed led the court to further question his reliability and the reliability of Savannah Shoals's other experts who based their work on his opinions.

the maps themselves or on the opinions Brigden drew from the maps in its highest-and-best-use analysis.[9]

B.    *The tax court applied the appropriate legal test to analyze the Property's highest and best use*

Next, Savannah Shoals challenges the method the tax court used to reject its proposed highest and best use and adopt the Commissioner's instead.  Savannah Shoals argues that caselaw and the governing statutory provisions require the tax court "to consider all four [highest and best use] criteria when determining the fair market value of a qualified conservation easement contribution."  Not only did the court fail to recite the correct legal standard, Savannah Shoals argues, but the court disregarded any criteria and instead "determine[d] the property's [highest and best use] solely on a market and demand analysis."  By reciting the wrong standard and failing to apply the necessary criteria, Savannah Shoals contends, the court committed legal error.

The Commissioner responds that while experts and the tax court sometimes rely on a four-factor test, no authority has mandated its application in this context.  He contends that based on the caselaw and regulations governing this analysis, it was appropriate for the tax court to focus on the likelihood that the Property would have been used in the way Savannah Shoals proposed, an inquiry which necessarily involved consideration of

---

[9] And, in fact, even in the court's valuation analysis, Brigden's "mining opinions" were peripheral to its own conclusions.

market demand for such a use. We agree with the Commissioner that the tax court was not required to apply these four criteria and that its analysis used the correct legal framework.

"We review the tax court's legal conclusions *de novo* and its findings of fact for clear error." *Palmer Ranch*, 812 F.3d at 993. "Whether the Tax Court used the correct standard to determine fair market value is a legal issue." *Id.* at 993–94 (alteration adopted) (quotation omitted).

As a reminder, a taxpayer may claim a deduction for the donation of a conservation easement based on the fair market value of the easement. 26 C.F.R. § 1.170A-14(h)(3)(i). The fair market value, in turn, depends on the highest and best use of the underlying property before and after the easement's creation. *TOT Prop.*, 1 F.4th at 1369. The framework for determining a property's highest and best use in this context begins with the Treasury Regulations themselves:

> [T]he fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

26 C.F.R. § 1.170A-14(h)(3)(ii).  Based on this instruction, we have explained that "[t]he highest and best use is one that is a 'reasonable and probable use that supports the highest present value,' with a 'focus on the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'"  *TOT Prop.*, 1 F.4th at 1369 (omissions adopted) (quoting *Palmer Ranch*, 812 F.3d at 987).

This language—"[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future"—originates from a 1934 Supreme Court decision discussing the highest-and-best-use analysis in the eminent domain context.  *See Olson v. United States*, 292 U.S. 246, 255 (1934).  In *Olson*, the Court provided guidance on how to determine a property's reasonable highest and best use for the purposes of assigning a value to the property.  *Id.*  The Court instructed that "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future," while not itself "the measure of value," was relevant to the "extent that the prospect for such use affects the market value."  *Id.*  The Court warned against "allow[ing] mere speculation and conjecture to become a guide for the ascertainment of value," noting that courts should "exclude[] from consideration" any "[e]lements affecting value that depend on events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable."  *Id.* at 257.

While not all principles arising in the eminent domain context necessarily apply to this one, this Court and other circuits have applied the *Olson* Court's explanation of fair market value in the conservation easement context.  *See Palmer Ranch*, 812 F.3d at 987 (quoting a tax court case which, in turn, quoted *Olson*); *Brooks v. Comm'r*, 109 F.4th 205, 219 (4th Cir. 2024); *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 335 (5th Cir. 2010); *Corning Place Ohio, LLC v. Comm'r*, 158 F.4th 715, 722 (6th Cir. 2025); *Esgar Corp. v. Comm'r*, 744 F.3d 648, 659 (10th Cir. 2014) (explicitly concluding that "the objective assessment that [§ 1.170A-14(h)(3)(ii)] requires does not materially differ from that used to determine the highest and best use of property for just compensation valuation").

This language from *Olson* ("[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future," 292 U.S. at 255) thus provides a broad framework for the highest-and-best-use analysis, while the text of the regulation focuses the analysis on specific considerations.  These considerations include (1) the current use of the property; (2) the likelihood of the property being developed, absent the easement; (3) how soon such development would be likely to take place; and (4) whether zoning, conservation, or historic preservation laws are likely to restrict the proposed use.  26 C.F.R. § 1.170A-14(h)(3)(ii).  Applying this combined framework, we have considered whether it was "reasonably probable" that a zoning body would approve a proposed use, *Palmer Ranch*, 812 F.3d at 996–97; whether a proposed use was "needed or likely to be needed in the reasonably near future" (a "market-demand"

inquiry), *id.* at 997–99; and whether the physical features and location of a property made the proposed use likely, *TOT Prop.*, 1 F.4th at 1370–72. Such inquiries assist the court in determining whether the evidence demonstrates a proposed use is "reasonable and probable" or instead is "too risky to qualify." *Id.* at 1369 (quotations omitted).

Savannah Shoals contends that we should instead require the tax court to strictly apply four highest-and-best-use criteria commonly invoked in this context. Its test would require that the proposed use be "(1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive" (the "appraisal factors"). These factors appear to be commonly used by appraisers; both Savannah Shoals's and the Commissioner's experts invoked them in their reports, pointing to Appraisal Institute standards. The tax court has likewise sometimes applied the appraisal factors in this context. *See, e.g.*, *Buckelew Farm, LCC v. Comm'r*, T.C.M. (RIA) 2024-052, at *32 (2024), *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025).[10] These factors overlap significantly with the considerations we draw from the regulation and our caselaw, as outlined above. To the extent the appraisal factors assist the tax court in its inquiry and are consistent with the

---

[10] It is worth noting, though, that even the tax court cases Savannah Shoals cites do not mandate strict application of this test. *See, e.g.*, *Estate of Lloyd v. Comm'r*, 71 T.C.M. (CCH) 1903, at *11 (1996) ("While the guidelines [containing the test] may control the profession to which these [expert] witnesses belong, [those] guidelines are not binding on this Court.").

regulation's text and our caselaw, it is not impermissible for the tax court to rely on them.

Contrary to Savannah Shoals's contention, though, neither this Court nor any other circuit court has required strict application of the appraisal factors in the conservation easement context. Savannah Shoals points to a Tenth Circuit decision for support, but that decision did not come close to holding that these four factors were a requirement. *See Esgar Corp.*, 744 F.3d 648. In *Esgar Corp.*, the Tenth Circuit considered whether "eminent domain principles" were "[]applicable when valuing conservation easements." *Id.* at 659. The court concluded that they were, noting that the taxpayers' own experts and arguments invoked eminent domain caselaw and "refer[red] to a four-factor highest and best use test that finds significant use in eminent domain cases." *Id.* In a footnote, the Tenth Circuit recited the four appraisal factors and noted that "the Tax Court has considered these factors when determining the highest and best use of eased property." *Id.* at 659 n.10. It did not, however, mandate, or even specifically approve, the use of these factors. We decline to require the tax court to strictly apply these four appraisal factors or to hold any failure to do so *per se* legal error.

Leaning, then, on the guidance from the regulations and our caselaw, we have no difficulty concluding that the tax court applied the correct legal standard when it assessed proposed highest and best uses based on market demand. The court recited the *Olson* standard for highest and best use and explained that its analysis

involved "an objective assessment of the likelihood that the property would have been put to such use absent the easement." It further explained that the highest and best use of a property must be "'reasonably probable,' 'legal,' 'physically possible,' and 'financially feasible.'" The court noted, though, that the parties' primary disagreement was whether a quarry was a financially feasible use of the Property. These considerations generally align with those we outlined from the regulation and our caselaw, and thus the court's analysis did not rely on an erroneous legal standard.

The court then focused its analysis on whether the market would support a quarry on the Property, an inquiry we have specifically required when determining highest and best use. *Palmer Ranch*, 812 F.3d at 998 (holding that "the highest-and-best-use test requires an inquiry . . . into whether the market will demand the use"). The court concluded, after an extended analysis, that a "quarry was not financially feasible" because it was "highly unlikely that the market would have supported [Savannah Shoals's] profitability conclusions." While Savannah Shoals may disagree with the tax court's factual findings (which disagreement we will consider below), the court's methodology and reliance on market demand was consistent with the appropriate legal standard. *Id.*; *see also Corning Place*, 158 F.4th at 723 (noting that the taxpayer had failed to demonstrate market demand for its proposed use).

C.    *The tax court did not clearly err in its factfinding, and its highest-and-best-use analysis provided sufficient findings of fact and conclusions of law for this Court to review*

In addition to challenging the tax court's articulation of the applicable highest-and-best use test, Savannah Shoals also contends that various aspects of the court's factfinding and analysis regarding the Property's highest and best use were erroneous. We conclude that none of the challenged findings were clearly erroneous.

"A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to *de novo* review." *Palmer Ranch*, 812 F.3d at 994 (quotation omitted). "Clear error is a highly deferential standard of review." *Holladay v. Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009) (quotations omitted). If the tax court's finding is "plausible in light of the record viewed in its entirety," we will affirm even if we "would have weighed the evidence differently." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). Put differently, "where there are two permissible views of the evidence, the tax court's choice between them cannot be clearly erroneous." *Curtis Inv. Co.*, 909 F.3d at 1347 (quotation omitted). Absent special circumstances, "the taxpayer retains the burden of proving the amount of his deduction." *Palmer Ranch*, 812 F.3d at 1002 (quotation omitted).

First, Savannah Shoals challenges the tax court's highest and best use analysis because the court rejected Savannah Shoals's proposed use without performing its own quantitative analysis of

a possible quarry use. Savannah Shoals insists that the tax court's failure to "include a quantitative analysis of a quarry use in its opinion" "renders appellate review practically impossible," making remand necessary. Savannah Shoals further argues that the court erred in concluding a quarry was not financially feasible, because as long as "the proposed use produces a positive return," it is financially feasible. Savannah Shoals seems to call for a categorical rule that if "a proposed use of the subject property likely will produce a positive return, it meets the financial-feasibility criteria for determining" highest and best use. Once the court determines which proposed uses are financially feasible, Savannah Shoals says, it should compare them and select the one that "produces the highest price or value for the subject property." We disagree.

The tax court's decision following a proceeding before it must include "its findings of fact." 26 U.S.C. § 7459(b). When the court fails to "provide a sufficient explanation to support its" legal conclusions, we will remand for the court to "provide sufficient reasoning." *Guevara v. Lafise Corp.*, 127 F.4th 824, 832–33 (11th Cir. 2025); *Curtis v. Comm'r*, 623 F.2d 1047, 1051 (5th Cir. 1980) ("The findings and conclusions [of the tax court] must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." (quotation omitted)).

Beyond this requirement of a "sufficient explanation," however, we have never required the tax court to perform its own quantitative analysis in order to determine a property's highest and

best use, and Savannah Shoals can point to no caselaw from this Court or any other circuit requiring such a calculation to determine a property's highest and best use.[11]  Nor have we adopted a categorical rule that a proposed use is financially feasible whenever that proposed use produces a positive return.[12]  Instead, we have called for an inquiry into "whether the proposed use will, in reasonable probability, be needed or likely to be needed in the

---

[11] Savannah Shoals cites a Ninth Circuit opinion remanding a case to the tax court for it to "fix a definite amount as the fair market value" based on the evidence before it.  *Gersten v. Comm'r*, 267 F.2d 195, 199 (9th Cir. 1959).  The tax court here did precisely that, ultimately determining that the "easement had a fair market value on the donation date of $480,000," based on a "before" value of $580,000 and an "after" value of $100,000.  Savannah Shoals does not challenge the tax court's method of reaching that valuation, once the court had rejected its proposed highest and best use.

[12] Indeed, this portion of Savannah Shoals's briefing is light on citations to caselaw altogether.  It points to one tax court and one bankruptcy court opinion as support for this proposition.  These cases are not binding on this Court, *see, e.g.*, *Kroner v. Comm'r*, 48 F.4th 1272, 1276 (11th Cir. 2022), nor do they provide persuasive support for Savannah Shoals's argument.  The tax court opinion simply recited the financial feasibility test the experts in the case had offered before performing a similar qualitative analysis to the one Savannah Shoals challenges here.  *See Champions Retreat Golf Founders, LLC v. Comm'r*, 124 T.C.M. (CCH) 267, at *12 (2022).  And the bankruptcy opinion's assessment of whether a particular use would generate a positive return arose in the context of a property that was already being used for the purpose (specifically, it was already operating as a hospital).  *See In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2008 WL 2037592, at *14, *17 (Bankr. D.D.C. May 12, 2008).  This bankruptcy case may demonstrate how a quantitative analysis might be helpful in certain contexts, but it in no way sets out a categorical rule for financial feasibility whenever there is the slightest positive return.

reasonably near future—in other words, into whether the market will demand the use." *Palmer Ranch*, 812 F.3d at 998 (quotation omitted). This analysis might often take a qualitative approach, as did the tax court's analysis here. For example, in *Palmer Ranch*, this Court determined that the market demanded the proposed use because the "market for [such] development was bullish," there was "high demand for open land" in the area, and the sale of comparable parcels demonstrated the likelihood of development. *Id.* at 998–99. Similarly, in approving the tax court's rejection of the proposed use of "residential development" in another case, we noted that "the nearest highway was about 32 miles away, and there was no hospital in the county"; there "were no population centers within a distance that might suggest residential development"; and other such developments nearby had not been successful, despite having "superior attributes" such as scenic views or nearby lakes. *TOT Prop.*, 1 F.4th at 1370–72; *see also Brooks*, 109 F.4th at 220–21 (upholding the tax court's rejection of a taxpayer's proposed highest and best use based on findings that the taxpayer's expert's approach was "too speculative" and "insufficiently plausible" to support the proposed use). Such a qualitative analysis is sufficient to answer the question of "whether the market will demand" the proposed use. *Palmer Ranch*, 812 F.3d at 998.

Thus, the tax court was not required to perform a quantitative analysis of a quarry use. Nor did it need to conduct its own "number crunching" to see "whether the return from a quarry would be a positive, but lesser, amount," which might lead it to "conclude that a quarry would produce a positive return less than

[Savannah Shoals's] experts determined but . . . greater than its value for low-density residential and recreational use," as Savannah Shoals argues.[13] The court acted within its discretion when it evaluated the proposed quarry use based on qualitative factors that undermined its viability as the Property's highest and best use.[14] In its discussion of whether a quarry was a reasonable use of the Property, the court assessed the evidence Savannah Shoals's experts offered and found two key flaws: first, that Savannah Shoals's experts had "severely overestimated demand for aggregate" and, second, that they "failed to account for the fact that competing quarries had substantial delivered price advantages over the proposed quarry because of their locations." On each of these points, the tax court discussed the testimony offered by each

---

[13] In its reply, Savannah Shoals argues that the tax court's rejection of its proposed use based solely on market demand was erroneous because "market analysis and demand" is "merely one factor to be considered, as one of many inputs in a DCF analysis when valuing property under the income approach." But Savannah Shoals conflates the income method of *valuation* with the necessary antecedent analysis of *highest and best use*. As discussed above, "the highest-and-best-use test requires an inquiry . . . into whether the market will demand the use." *Palmer Ranch*, 812 F.3d at 998. And, even when it comes to valuation, "[t]he tax court has discretion to adopt a valuation method befitting the matter before it—even if the parties have not proposed that method." *Id.* at 1003 n.18.

[14] Aside from a few specific aspects of the evidence presented by the Commissioner's two experts (Brigden, discussed above, and Gunesch, discussed below) Savannah Shoals does not challenge any of the tax court's specific factual findings that contributed to the court's highest-and-best-use conclusion, focusing rather on the court's methodology.

party's experts at length and made specific findings. Because the taxpayer bears the burden of proving the amount of the deduction, *see Palmer Ranch*, 812 F.3d at 1002, the tax court did not err in rejecting Savannah Shoals's argument that a quarry was the Property's highest and best use when it found Savannah Shoals's evidence unconvincing. In the light of the full record, the court's factual findings and resulting conclusions certainly result from "permissible" views of the evidence and thus "cannot be clearly erroneous." *Curtis Inv. Co.*, 909 F.3d at 1347 (quotation omitted).[15]

Next, Savannah Shoals contends that the tax court erred in relying on Commissioner expert Gunesch. Savannah Shoals identifies "two mistaken inputs" in Gunesch's DCF analysis that it contends make the difference between Gunesch's calculated net present value and its own experts' conclusions: (1) the calculation of likely operating expenses based on data from a publicly traded company and (2) the relevant tax rate. It does not, however, assert that these purported mistakes constitute error by the tax court. In fact, it admits that the tax court "did not adopt . . . the DCF analysis of the Commissioner's expert Gunesch." And the court did not

---

[15] The tax court's ultimate conclusion regarding the easement's value is bolstered by its reliance on an arm's-length sale of the Property: the developer initiated the sale of a 92% interest in the Property for $515,000 less than three months before the easement contribution, and the sale was completed shortly before the contribution. We have considered such a recent arm's-length sale "overwhelmingly significant" evidence of the value of an easement and support for the tax court's highest-and-best-use determination leading to its valuation. *TOT Prop.*, 1 F.4th at 1371.

24-12661               Opinion of the Court                    33

discuss these aspects of Gunesch's analysis for good reason: they were not relevant to the court's ultimate conclusion, which turned on market demand and competition.[16]  For that reason, these purported factual errors do not undermine the tax court's ultimate determination of the Property's highest and best use.[17]

Finally, Savannah Shoals argues that Commissioner expert Brigden's proposed highest and best use was flawed because he "failed to meaningfully consider a quarry use."  This argument fails for the reason discussed previously: the tax court did not rely on Brigden in reaching its conclusion that "an aggregate quarry was not financially feasible."  Instead, only after concluding that a quarry was not a "reasonable and probable use" for which the Property was "likely to be needed in the reasonably near future," *TOT Prop.*, 1 F.4th at 1369 (quotations omitted), did the court find credible and adopt the only other proposed use: low-density residential and recreational use.

In short, we are not "left with the definite and firm conviction that a mistake has been committed," so we will not

---

[16] Put differently, it cannot be clearly erroneous for the tax court to *listen* to evidence that might be inaccurate if it does not ultimately rely on that evidence.

[17] In its reply, Savannah Shoals argues that other of the tax court's factual findings are "inconsistent and contradictory" and further disputes another of Gunesch's calculations.  We need not address these claims because "arguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (alteration adopted) (quotations omitted).

disturb the tax court's factual findings or its resulting conclusion regarding the Property's highest and best use. *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quotations omitted).

## IV.    Conclusion

For these reasons, we conclude that the tax court did not apply an incorrect legal standard nor did it clearly err in its factual findings regarding the Property's highest and best use. We therefore affirm the tax court's judgment.

**AFFIRMED.**